**FILED**
**Sep 07, 2018**
**10:58 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MURFREESBORO

| | | |
|---|---|---|
| **DOUGLAS KRUPLA,** | ) | **Docket No. 2018-05-0267** |
| **EMPLOYEE,** | ) | |
| **v.** | ) | |
| | ) | |
| **EAGLE TRANSPORT CORP.** | ) | **State File No. 62286-2017** |
| **EMPLOYER,** | ) | |
| **and** | ) | |
| | ) | |
| **GREAT WEST CAS. CO.,** | ) | **Judge Dale Tipps** |

---

## EXPEDITED HEARING ORDER GRANTING BENEFITS

---

This matter came before the Court on August 29, 2018, for an Expedited Hearing. The present focus of this case is whether Mr. Krupla is entitled to the total knee replacement surgery ordered by Dr. Michael Jordan, his authorized treating physician (ATP). The central legal issue is whether he is likely to establish at a hearing on the merits that his need for total knee replacement resulted from a compensable aggravation of a preexisting condition. For the reasons below, the Court finds that Mr. Krupla would likely meet this burden and orders Eagle Transportation to provide the recommended surgery.

## History of Claim

Mr. Krupla worked for Eagle Transportation as a truck driver. He testified that his job required significant physical capabilities, including climbing and heavy lifting, which he performed with no problems before his work accident. Although he had some prior issues and treatment involving his left knee, those had resolved, and he was having no pain or difficulty with his knee until August 15, 2017.

On that date, Mr. Krupla attempted to step up into his truck when the step gave way, catching his boot and causing his left knee to bend and pop. He fell to the ground, suffering multiple injuries. Eagle accepted the claim and provided medical and

1

temporary disability benefits.

*Medical Treatment*

Mr. Krupla's medical treatment began at St. Thomas Rutherford Hospital on the day of the accident. Emergency room records show that he reported pain in his thoracic spine, left knee, and right groin.

After his discharge from the ER, Eagle provided a panel of physicians, and Mr. Krupla selected Concentra. His treatment there included several visits for pain in his back, groin, and left knee. He testified that, even though Concentra's records did not always reflect it, he experienced increasing pain in his left knee throughout the course of his treatment. Mr. Krupla felt that the Concentra doctors were more concerned about his back until he insisted they address his knee problem.

Concentra's records show Mr. Krupla's first visit was August 17, when he saw Dr. William Dutton. Dr. Dutton noted complaints of pain in the right shoulder, back, left knee, and groin. He also noted, "States left knee and right hip feel ok now." Along with other injuries, Dr. Dutton assessed "contusion of left knee, initial encounter."

Mr. Krupla returned to Concentra and saw Dr. Frank Thomas on August 25. Regarding the left knee, Dr. Thomas noted, "The symptoms are improving."

Two subsequent visits to Concentra on September 5 and September 7 focused primarily on Mr. Krupla's back pain. The records from those visits make no specific mention of ongoing knee pain but do refer to unspecified "joint pain." These examinations led to an orthopedic specialist referral for thoracic spine pain.

Mr. Krupla returned to Concentra on October 31 for a recheck of his knee injury. In the History of Present Illness section, Dr. Thomas noted in part:

> The symptoms are unchanged. Symptoms are located in the left knee and left medial knee. The symptoms occur frequently. The patient describes the pain as sharp and burning. The severity of the pain is moderate. . . . He continues to limp and have pain medial knee and swells at intervals. It has not improved since the original injury.

Dr. Thomas also found tenderness over the medial joint line and a positive medial McMurray test. He noted "roughly 25% of anticipated healing has taken place" and referred Mr. Krupla for an MRI and orthopedic specialist.

Dr. Jordan, an orthopedic surgeon, saw Mr. Krupla a few days later. An MRI showed a medial meniscus tear and degenerative joint disease. After treating Mr. Krupla

2

for several weeks, Dr. Jordan recommended an arthroscopic partial medial meniscectomy stating, "I do think the work injury that he sustained that he has described to me is responsible for the surgery that is being proposed."

Utilization Review denied the recommended arthroscopic procedure. Upon appeal, the Bureau's Assistant Medical Director upheld the denial and stated, "The demographics and the degree of arthritis on MRI would be consistent with ODG criteria for arthroplasty, but is not congruent with indications for meniscectomy or microfracture." After receiving that Bureau decision, Dr. Jordan recommended arthroplasty (total knee replacement).

*Causation Questionnaires*

While treating Mr. Krupla, Dr. Jordan responded to several written questionnaires regarding causation. The first questionnaire, sent by the carrier, asked the doctor to address causation based on the following facts: 1) that Mr. Krupla said in a recorded statement three days after his accident that his knee was sore, but he didn't think it was injured; and 2) his next complaints of knee pain were two months later. Dr. Jordan prefaced his responses by stating, "This sequence of events would not support current treatment." The first question asked which percent of the current complaints and need for treatment were related to "a prior meniscus injury that the claimant reports happened roughly 2 years ago." Dr. Jordan responded that he was "unable to tell – in our computer seems like it was the right knee." He went on to say that he was unable to tell which percent of the current complaints and need for treatment were related to the August 15 work accident or to degeneration, although he stated, "WC is not responsible for the DJD – just the contusion."

The carrier's second questionnaire asked Dr. Jordan to assign causation percentages to his meniscectomy recommendation. He stated that the partial medial meniscectomy was 100% related to the contusion from the work accident.

After Dr. Jordan changed his recommendation to total knee replacement, Mr. Krupla's attorney sent him another questionnaire. The questions and Dr. Jordan's responses are as follows:

1) Is it your opinion . . . that Mr. Krupla's work-related knee injury resulted in an aggravation of any pre-existing or degenerative knee condition necessitating the need for medical treatment? YES
2) If yes, did this aggravation arise primarily out of the August 15, 2017 work injury? YES
3) Have Mr. Krupla's symptoms returned to their pre-injury baseline level? NO
4) What further medical treatment do you believe to be reasonable and

3

medically necessary in order to treat this injury or aggravation?  A/A
KNEE OR TKR

A fourth causation questionnaire came from Mr. Krupla's independent medical evaluation (IME) with Dr. David West, performed at Eagle's request.  Dr. West confirmed that Mr. Krupla had a knee contusion, but he felt there was no objective aggravation to the preexisting arthritis.  He agreed that a knee replacement was an option, but he did not feel Mr. Krupla's fall caused the need for the procedure.  He concluded, "[I]t is my opinion that the patient's need for treatment is due to his underlying ordinary progression of life and osteoarthritis and not directly related, certainly less than 51% related, to the injury of fall to the left knee."

### Dr. West's Deposition

Dr. West testified that there was no way to determine how long Mr. Krupla's meniscus had been torn, but "it's easy to say that he had very bad arthritis in three compartments of his knee" before the workplace accident.  He observed that the early Concentra notes reflected improvement in the knee, and the September visit notes made no mention of knee pain.  From this, he concluded that Mr. Krupla had returned to his pre-fall baseline.  Dr. West stated, "[T]he advanced osteoarthritis is the primary cause in the need for knee replacement.  And of course pain is a very big deciding factor for knee replacements, but if you base a percentage again as related to this accident, I'd say it's very small."  He felt the fall caused no structural change to the knee and characterized Mr. Krupla's condition as "a temporary exacerbation of an underlying condition."

On cross-examination, Dr. West testified that he never discussed Mr. Krupla's medical records with him or asked him whether his symptoms ever resolved.  Shown the October 31 Concentra note, he admitted that if correct, the note would mean that Mr. Krupla's knee had not returned to baseline.  He also admitted that, if Mr. Krupla had continuing pain between the injury and the time Concentra ordered the MRI, he would characterize the exacerbation as chronic.

### Dr. Jordan's Deposition

Eagle's counsel asked Dr. Jordan to review Mr. Krupla's Concentra records from August 17 through September 7 and then asked, "[A]ssuming he had a resolution of pain from August 25th through the date you saw him on November 8th, 2017, is it your opinion that he returned to baseline condition?"  Dr. Jordan responded, "If his baseline condition was no pain and he was having no pain as of two days post-injury, through the several visits that we looked at, I would say the answer to that is yes."  He went on to testify that, based on these assumptions, his opinion may have changed to, "in fact everything going on in his knee may be related more to DJD than to the injury."  Further, based on the August and September Concentra visits, he felt that the aggravation of Mr. Krupla's

4

preexisting arthritis was temporary.

On cross-examination, Dr. Jordan acknowledged it was difficult to tell from the August Concentra records whether Mr. Krupla actually complained of knee pain. Upon being shown the October 31 record, he agreed it indicated Mr. Krupla was having knee pain throughout the course of his treatment at Concentra. Assuming Mr. Krupla had no symptoms or knee pain before the work accident and had consistent pain afterwards, Dr. Jordan felt that his recommended treatment was necessary due to an aggravation of a preexisting condition. Again, asked to assume that Mr. Krupla's symptoms did not resolve after the accident, Dr. Jordan reaffirmed the opinions in his response to the questionnaire from Mr. Krupla's attorney.

Mr. Krupla requested that the Court order Eagle to provide additional medical treatment, specifically the total knee replacement recommended by Dr. Jordan.

Eagle countered that the Court should deny the surgical procedure because Mr. Kupla failed to establish he would likely prevail at a hearing on the merits in proving his work injury primarily caused his current need for treatment. Specifically, it argued that Mr, Krupla suffered a temporary, non-compensable aggravation of his preexisting joint disease.

### Findings of Fact and Conclusions of Law

Mr. Krupla need not prove every element of his claim by a preponderance of the evidence in order to obtain relief at an expedited hearing. Instead, he must come forward with sufficient evidence from which this Court might determine he is likely to prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015). To qualify for medical benefits at an interlocutory hearing, an injured worker who alleges an aggravation of a pre-existing condition must offer evidence that the aggravation arose primarily out of and in the course and scope of employment. That is, Mr. Krupla must come forward with sufficient evidence from which the Court can determine that he would likely establish, to a reasonable degree of medical certainty, that the work accident contributed more than fifty percent in causing the aggravation, considering all causes. Tenn. Code Ann. § 50-6-102(14); *Miller v. Lowe's Home Centers, Inc.,* 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at *18 (Oct. 21, 2015).

In order to establish causation, Mr. Krupla relies on the ATP, Dr. Jordan, whose opinion is presumed correct. *See* Tenn. Code Ann. § 50-6-102(14)(E). One of the difficulties faced by the Court is that Dr. Jordan gave apparently conflicting causation opinions.[1] This conflict is resolvable, however. At its essence, Dr. Jordan's opinion

---

[1] The Court finds it unnecessary to address the first two questionnaires completed by Dr. Jordan, as they

depends on one factual issue: Did Mr. Krupla have continuing pain from the date of his accident until Concentra ordered an MRI and made an orthopedic referral on October 31? If so, Dr. Jordan would say the work injury made the surgery necessary because it aggravated a preexisting condition. If not, he would view the aggravation as temporary and, therefore, not the cause of his current need for surgery.

Mr. Krupla testified about this issue. Specifically, he said that he had no pain in his left knee or any limitations at work or other activities before his work injury. After the accident, he experienced increasing pain in his left knee throughout the course of his treatment at Concentra but had difficulty getting the doctors to address his knee injury. The Court notes that Mr. Krupla appeared steady, forthcoming, reasonable, and honest, which characteristics, according to the Tennessee Supreme Court, are indicia of reliability. *See Kelly v. Kelly,* 445 S.W.3d 685, 694-695 (Tenn. 2014). His testimony is also supported by the October 31 Concentra record, which states, "He continues to limp and have pain medial knee and swells at intervals. It has not improved since the original injury." Further, Eagle provided no testimony from the nurse case manager or any Concentra personnel to rebut Mr. Krupla's characterization of his knee problems. The Court therefore finds Mr. Krupla to be credible and accepts his description of progressive knee pain through the period of his Concentra treatment.

Eagle contends that the Concentra records show that Mr. Krupla's knee pain subsided within a couple of weeks after the accident. The Court recognizes that the medical records contain a number of somewhat inconsistent or incomplete descriptions of Mr. Krupla's symptoms. However, medical records are rarely infallible. Further, the records do not show that Mr. Krupla repeatedly changed his description of the accident or the cause of his knee pain. Instead, his primary complaints simply varied from visit to visit with no explanation or emphasis. Mr. Krupla attributed this to the medical providers continued focus on injuries to body parts other than his knee. Other causes for these variations may be attributable to Concentra's record-keeping or the fact that more than one doctor saw Mr. Krupla during his treatment there. There is no indication that these explanations are less likely than an actual lack of knee symptoms experienced by Mr. Krupla, especially in view of the final Concentra record that stated that his knee condition "is unchanged." Without testimony from the Concentra doctors or some other evidence, the Court is unwilling to assume that Mr. Krupla had no knee symptoms, based solely on the relative lack of recorded knee symptoms in a few of the medical records. Further, to the extent that Eagle suggested that Mr. Krupla must have suffered some sort of intervening injury before October 31, it presented no proof supporting this contention.

Having found that Mr. Krupla suffered relatively constant knee pain through October 31, the Court accepts Dr. Jordan's opinion that Mr. Krupla's work injury was the

---

both failed to ask his opinion regarding total knee replacement or whether it was made necessary by an aggravation of Mr. Krupla's preexisting condition.

6

primary cause of the aggravation of his degenerative knee condition. As noted above, this opinion is entitled to a presumption of correctness.

Eagle contends that Dr. West's testimony is sufficient to overcome the presumption. To make this determination, the Court must compare the opinions of Dr. West and Dr. Jordan.

> When the medical testimony differs, the trial judge must obviously choose which view to believe. In doing so, he is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts.

*Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991).

Applying the first of these factors, the Court notes that both physicians are orthopedic surgeons. Although both of their deposition transcripts indicate that their curriculum vitae were exhibits to their testimony, neither of the transcripts filed with the court included those exhibits. In the absence of any information concerning their respective qualifications, the Court cannot find any determinative differences between the doctors.

As to the other factors, the circumstances of the respective examinations are different, in that Mr. Krupla was an established patient with Dr. Jordan, while he only saw Dr. West once. However, it appears that the information available to the doctors was comparable. Overall, the Court finds little difference between the doctors, other than their actual conclusions. Thus, Dr. West's testimony must be sufficient on its own to overcome the presumption in favor of Dr. Jordan.

The primary problem with Dr. West's opinion is that he predicated it on the assumption that Mr. Krupla's knee condition resolved within a couple of weeks and "returned to baseline." However, he based that assumption solely on his review of the first few Concentra notes. Dr. West admitted he did not discuss Mr. Krupla's medical records with him or ask him whether his symptoms ever resolved. Further, he conceded that if the October 31 note were correct, that would mean Mr. Krupla's knee did not return to its baseline symptoms and that the exacerbation of his osteoarthritis was chronic. As the Court has already determined that Mr. Krupla's knee pain never fully subsided, this testimony not only fails to overcome the presumption of correctness, but it actually supports Dr. Jordan's opinion.

After careful consideration, the Court finds that Dr. West's analysis and conclusions are insufficient to overcome the presumption of correctness of Dr. Jordan's causation opinion. Mr. Krupla therefore appears likely to prevail at a hearing on the

merits in proving that he suffered an aggravation, arising primarily out of and in the course and scope of employment, of his preexisting degenerative joint disease. Therefore, the Court concludes Eagle must provide the knee replacement surgery recommended by Dr. Jordan.

**IT IS, THEREFORE, ORDERED** as follows:

1. Eagle Transport Corporation shall provide Mr. Krupla with medical treatment made reasonably necessary by the August 15, 2017 injury in accordance with Tennessee Code Annotated section 50-6-204, including the knee replacement surgery recommended by Dr. Jordan.

2. This matter is set for a Scheduling Hearing on October 31, 2018, at 9:00 a.m. The parties must call 615-741-2112 or toll-free at 855-874-0473 to participate. Failure to call in may result in a determination of the issues without the parties' participation. All conferences are set using Central Time.

3. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

4. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email at WCCompliance.Program@tn.gov.

**ENTERED this the 7ᵗʰ day of September, 2018.**

_____

**Judge Dale Tipps**
**Court of Workers' Compensation Claims**

8

**APPENDIX**

Exhibits:
1. Affidavit of Douglas Krupla
2. Indexed medical records
3. Dr. West's IME report
4. Deposition transcript of Dr. David West
5. Deposition Transcript of Dr. Michael Jordan
6. Transcript of Douglas Krupla's recorded statement (Identification Only)

Technical record:
1. Petition for Benefit Determination
2. Request for Expedited Hearing
3. Dispute Certification Notice
4. Employer's Pre-Hearing Brief
5. Employee's Brief in Support of Request for Expedited Hearing
6. Employee's Supplemental Brief in Support of Request for Expedited Hearing

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 7th day of September, 2018.

| Name | Certified Mail | Fax | Email | Service sent to: |
|------|----------------|-----|-------|-------------------|
| Michael Fisher, Employee's Attorney | | | X | mfisher@ddzlaw.com |
| Marianna Joblonski, Employer's Attorney | | | X | mjablonski@wimberlylawson.com |

_____
**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**

9



<u>Expedited Hearing Order Right to Appeal</u>:

If you disagree with this Expedited Hearing Order, you may appeal to the Workers' Compensation Appeals Board.  To appeal an expedited hearing order, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within seven business days* of the date the expedited hearing order was filed.  When filing the Notice of Appeal, you must serve a copy upon all parties.

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of the appeal.**

3. You bear the responsibility of ensuring a complete record on appeal.  You may request from the court clerk the audio recording of the hearing for a $25.00 fee.  If a transcript of the proceedings is to be filed, a licensed court reporter must prepare the transcript and file it with the court clerk *within ten business days* of the filing the Notice of Appeal.  Alternatively, you may file a statement of the evidence prepared jointly by both parties *within ten business days* of the filing of the Notice of Appeal.  The statement of the evidence must convey a complete and accurate account of the hearing.  The Workers' Compensation Judge must approve the statement before the record is submitted to the Appeals Board.  If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. If you wish to file a position statement, you must file it with the court clerk within *ten business days* after the deadline to file a transcript or statement of the evidence.  The party opposing the appeal may file a response with the court clerk *within ten business days* after you file your position statement.  All position statements should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



**Filed Date Stamp Here**

**EXPEDITED HEARING NOTICE OF APPEAL**
Tennessee Division of Workers' Compensation
www.tn.gov/labor-wfd/wcomp.shtml
wc.courtclerk@tn.gov
1-800-332-2667

Docket #: _____

State File #/YR: _____

RFA #: _____

Date of Injury: _____

SSN: _____

_____

**Employee**

_____

**Employer and Carrier**

## Notice

Notice is given that _____

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the order(s) of the Court of Workers' Compensation Claims at _____

_____to the Workers' Compensation Appeals Board.

[List the date(s) the order(s) was filed in the court clerk's office]

**Judge**_____

## Statement of the Issues

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

## Additional Information

**Type of Case** [Check the most appropriate item]

☐ Temporary disability benefits
☐ Medical benefits for current injury
☐ Medical benefits under prior order issued by the Court

## List of Parties

**Appellant (Requesting Party):**_____At Hearing: ☐Employer ☐Employee

Address:_____

Party's Phone:_____Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code:_____

Attorney's Email:_____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ SF#: _____ DOI: _____

## Appellee(s)

**Appellee (Opposing Party):** _____ At Hearing: ☐ Employer ☐ Employee

Appellee's Address: _____

Appellee's Phone: _____ Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Address: _____ Phone: _____

Attorney's City, State & Zip code: _____

Attorney's Email: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Expedited Hearing Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties and/or their attorneys in this case in accordance with Rule 0800-02-22.01(2) of the Tennessee Rules of Board of Workers' Compensation Appeals on this the _____ day of _____, 20__.

[Signature of appellant or attorney for appellant] _____



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived.  The following facts support my poverty.

1. Full Name:_____

2. Address: _____

3. Telephone Number: _____

4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ | per month | beginning _____ |
| SSI | $ _____ | per month | beginning _____ |
| Retirement | $ _____ | per month | beginning _____ |
| Disability | $ _____ | per month | beginning _____ |
| Unemployment | $ _____ | per month | beginning _____ |
| Worker's Comp. | $ _____ | per month | beginning _____ |
| Other | $ _____ | per month | beginning _____ |

LB-1108 (REV 11/15)                                                                                                RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month     Medical/Dental  $ _____ per month

Groceries         $ _____ per month        Telephone       $ _____ per month

Electricity       $ _____ per month        School Supplies $ _____ per month

Water             $ _____ per month        Clothing        $ _____ per month

Gas               $ _____ per month        Child Care      $ _____ per month

Transportation    $ _____ per month        Child Support   $ _____ per month

Car               $_____ per month

Other             $ _____ per month (describe: _____ )

10. Assets:

Automobile              $ _____        (FMV) _____

Checking/Savings Acct. $ _____

House                   $ _____        (FMV) _____

Other                   $ _____        Describe:_____

11. My debts are:

| Amount Owed | To Whom |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires:_____